Filed 5/9/22  P. v. Torres CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ISAIAS ANDRADE TORRES,<br><br>    Defendant and Appellant. | F082190<br><br>(Super. Ct. No. VCF250768)<br><br>**OPINION** |

## <u>THE COURT</u>[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Lindsey K. Terry, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, David Andrew Eldridge and Cavan M. Cox, II, Deputy Attorneys General, for Defendant and Respondent.

-ooOoo-

---

[*]        Before Franson, Acting P.J., Meehan, J. and De Santos, J.

Defendant Isaias Andrade Torres appeals from an order denying his motion under Penal Code section 1473.7, subdivision (a)(1)[1] to vacate a 2012 plea of no contest. After receiving testimony and considering declarations and transcripts, the superior court stated that "the burden has not been met and I'm going to deny the motion."

Applying the independent standard of review set forth in *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), and giving deference to credibility findings where the superior court personally observed the witness, we conclude Isaias (1) established by a preponderance of the evidence that he did not meaningfully understand the mandatory immigration consequences (permanent deportation) of his no contest plea and (2) demonstrated a reasonable probability that he would have rejected the plea if he had understood those consequences.

We therefore reverse the order denying the section 1473.7 motion.

## BACKGROUND

Isaias was born in Mexico in August 1964 and came to the United States in 1982. His permanent resident card states he has been a resident since December 1990. Isaias's parents live in Tulare County. His father is approximately 80 years old and his mother is three or four years younger. Isaias has four brothers and one sister living in Tulare County. Isaias's brother Victor was born in Mexico in 1966 and his sister Araceli was born there in 1978.

From Isaias's arrival in 1982 until his arrest in 2011, he lived in Porterville and worked in Tulare County, often in agricultural jobs, such as field work and packing. Isaias has two children, and they are United States citizens. His son was born in June 1987 to his wife at the time. About a decade later, he had a daughter with a woman who had two other children. Isaias and his daughter's mother were together for about 10 years. Isaias helped raise and take care of their daughter and the mother's other two

---

[1] Unlabeled statutory references are to the Penal Code.

children.  Isaias and his daughter's mother separated about a year before charges were brought against him.

*The Charges*

In April 2011, Isaias was arrested for molesting his daughter, which acts allegedly occurred between May 29, 2009, and May 28, 2010.  In July 2011, a criminal information was filed against Isaias.  Isaias was charged with 12 counts of lewd acts with a child under the age of 14 years in violation of section 288, subdivision (a) and one count of a forcible lewd act with a child under the age of 14 years in violation of section 288, subdivision (b)(1).  Isaias was in jail from the time of his arrest until his sentencing.

Initially, Isaias was represented by a public defender.  Isaias's siblings, Araceli and Victor, retained attorney Thomas W. Degn from Visalia to represent Isaias and he substituted into the case as attorney of record.  Degn has been a licensed member of the State Bar of California since 2001.

Degn recalled that a preliminary hearing was held within a few months and that the trial was set and continued several times.  Degn testified he met with Isaias at the jail about eight to 10 times, sometimes to listen to recorded statements together.  Isaias testified that he did not remember exactly how many times they met at the jail and estimated that "it might have been three or four times."  They spoke in Spanish and Isaias stated that sometimes Degn would use some English words and that he knew "some words in English, but not that much."  One of the things they discussed was how long Isaias had been a lawful permanent resident of the United States—that is, when he got his green card.

Degn testified that he had two discussions with Isaias about the immigration consequences of the charges prior to trial.  One discussion took place at the jail and the other was at the courthouse.  Degn's advice to Isaias about the immigration consequences of the charges is described in part II.A.4., *post*.

*The Plea*

The trial was set for May 1, 2012. Before the jury was selected and while a motion in limine relating to a recorded statement was being considered, Degn asked the court if the tape being played could be paused so he could take a moment with Isaias "to see if perhaps we can resolve this. I know we've kind of gone at it a few times. The DA has not made any offer. The court's made a ruling on this." After a short discussion, the court stated that "if he wanted to plead for 12 years, I would do that."

After a discussion off the record, the deputy district attorney stated a 12-year sentence could be achieved by imposing "six years on Count 1 plus 2 through 12 concurrent" and an additional six years on Count 13. The court agreed with the proposed sentence structure and then asked Degn where they were from his standpoint. Degn replied: "I believe due to a concern of you know not wanting his daughter to have to testify and put her through that, he's willing to enter a no contest plea pursuant to People V West at this point and you know of course reserving any rights to appeal for the motion." The court then stated: "I'm assuming the reason for the plea is based on the court's ruling to allow the statement into evidence." Degn responded, "Correct." It appears they were referring to a recording of a statement made by Isaias before his arrest.

The court then asked Isaias a general question about whether he understood what was happening. Isaias answered, "Yes." The court then began a series of specific questions, which included the following exchange.

> "THE COURT: If you're not a citizen of the United States, you'll be deported. You won't be allowed naturalization, readmission to the United States, or re-entry into the United States. Do you understand that?
>
> "THE DEFENDANT: Yes.
>
> "THE COURT: Other than what's been said, has anyone promised you anything else or threatened you in any way to get you to enter a plea, sir?
>
> "THE DEFENDANT: No."

4.

After the superior court finished its questions to Isaias, the court asked Degn some questions and then took Isaias's no contest pleas to the 13 counts. The court vacated the jury trial scheduled for that day and set a sentencing date.

*The Motion to Withdraw the Plea*

Degn testified that he and Isaias "had some discussions pretty early on that he had wanted to withdraw his plea." Degn did not recall exactly how many days passed before he learned Isaias wanted to withdraw his plea, but estimated it was within a week or two. They also addressed Degn withdrawing as attorney of record. Degn testified that when Isaias "indicated that he wanted to withdraw his plea, I didn't see a basis, but I agreed that I would file it on his behalf, and that as part of that, I would then do a motion to withdraw as attorney, because if he was going to argue that he wasn't advised right or something didn't happen correctly, that there would be a conflict."

On June 7, 2012, Degn filed a motion to withdraw Isaias's no contest pleas pursuant to section 1081. The motion stated it was based on the ground that "defendant did not enter into a knowing, intelligent, and voluntary plea." The motion also stated: "It is believed that a conflict exists between Defendant, and his current counsel, and that another attorney will have to be appointed in this case. Defendant claims that he is innocent and wishes to have a fair and full trial on the matter."

On June 15, 2012, the superior court entered a minute order stating its finding of a conflict between Degn and Isaias, ordering Degn relieved as counsel of record, and appointing the public defender as Isaias's counsel for all purposes. In August 2012, Isaias's motion to withdraw his plea was denied. Later that month, Isaias was sentenced to 12 years in prison.

*Immigration Proceedings*

On September 1, 2020, the Department of Homeland Security (Department) issued a notice of custody determination stating Isaias was to be detained pending a final

administrative determination in his case. The Department also issued a warrant for arrest directing that Isaias be taken into custody for removal proceedings.

On September 17, 2020, Isaias was released from Avenal State Prison. He was immediately arrested by Immigration and Customs Enforcement (ICE) and the notice of detention and the arrest warrant were read to him in Spanish. Isaias also was provided with a notice to appear before an immigration judge in Aurora, Colorado on October 2, 2020. ICE initially took him to a detention facility in Fresno. Later, he was transferred to the ICE processing center in Aurora.

We take judicial notice of that fact that on November 19, 2020, an immigration judge in Aurora ordered Isaias's removal. (See Evid. Code, §§ 452, 455, 459.) This information is publicly available online through an Automated Case Information portal maintained by the United States Department of Justice.

*Motion to Vacate Plea*

On October 1, 2020, Isaias filed a motion to vacate his conviction pursuant to section 1473.7 in Tulare County Superior Court.[2] The prosecution filed an opposition asserting that (1) the court's advisement of the immigration consequences of the plea were understood by Isaias; (2) Isaias failed to show prejudice by a preponderance of evidence; and (3) his mere allegation of ineffective assistance of counsel did not carry his burden of proof. Isaias filed a reply, contesting the points raised in the opposition.

On October 21, 2020, the hearing on the motion to vacate commenced. Isaias, who was being held in Aurora, was not physically present in court. Isaias's counsel had subpoenaed Degn, the attorney who represented Isaias at the time of his plea. Degn was physically present in the courtroom and was the first witness called. Degn's testimony

---

[2]    Under the mandatory provisions of subdivision (b)(1) of section 1473.7, his motion "shall be deemed timely filed." (See *People v. Perez* (2021) 67 Cal.App.5th 1008, 1013.)

6.

about the conversations he had with Isaias about Isaias's immigration status and the immigration consequences of the charges are described in part I.A.4., *post*.

Isaias's counsel also subpoenaed records of the Tulare County Public Defender's Office. Erin Brooks, the supervising attorney of that office, attended the October 21, 2020 hearing and testified in the courtroom. As directed in the subpoena, Brooks brought copies of the record the public defender's office had for Isaias's case. The documents included numerous papers filed in the case and some handwritten notes. Brooks testified the public defender's office had been appointed to represent Isaias in 2011 and the paper files from that representation had been destroyed. She reviewed notes in an electronic system and found nothing "reflecting anything about immigration." She also reviewed the notes from the later appointment to represent Isaias in 2012 after Degn withdrew, and she found nothing about immigration consequences. Brooks also testified that she was not did handle Isaias's case in either 2011 or 2012.

After Brooks testified, the hearing was continued to October 28, 2020. On that day, three witnesses testified—Isaias's sister Araceli, his brother Victor, and Isaias himself. Araceli and Victor were physically present in the courtroom and testified using an interpreter. Isaias was at the detention facility in Aurora and appeared by telephone. The superior court told the interpreter that she would "be telling us what [Isaias] says in English" and that she would "be translating our English to Spanish and letting us know what he says, because we can't really hear him."

Araceli and Victor testified about retaining Degn and the conversations they had with him. The main point of their testimony was that Degn did not discuss with them the immigration consequences of the charges against Isaias. This testimony was offered to support the inference that Degn provided Isaias little or no advice about the immigration consequences of a plea or other conviction of the charges. Their testimony is not described at length here because we accept the superior court's implied finding that Degn's testimony about his conversations with Isaias was credible.

7.

Isaias testified by phone from the detention center in Aurora and used an interpreter. Isaias was unable to appear using video conferencing. Isaias testified that he asked Degn what was going to happen with his immigration status because he was a lawful permanent resident who had already been in the United States for 30 years. In describing that conversation, Isaias stated: "When I asked Mr. Degn that question, he just told me not to worry, that he was also gonna work on that, for me not to worry, everything was gonna be fine. But he never explained to me that that was gonna – that was gonna affect me."

Isaias also was asked many questions about the advice he received from Degn about the immigration consequences that would or could result from the charges. Some of the questions were open ended as to time and others specifically referenced the time of the plea. The ambiguity as to when Degn described the immigration consequences of the charges is not material to the outcome of this appeal, which turns on whether Isaias understood that deportation was *mandatory*. The issue of what Degn advised Isaias about mandatory deportation is resolved by Degn's testimony. (See pt. II.A.4., *post*.) We note, however, Isaias's testimony during his direct examination:

> "Q. Did Mr. Degn *ever* advise you that if you were convicted of these offenses that for immigration purposes it would be considered an *aggravated offense* and you would be subject to *mandatory deportation*?

> "A. No. He never told me anything about that." (Italics added.)[3]

After a question about getting ready to go to trial, Isaias was asked if he recalled entering a plea of no contest before trial. Isaias responded: "Yes. That's what [Degn]

---

[3] The terms "aggravate offense" and "mandatory deportation" are italicized because they are specific terms that significantly restrict the scope of the question. Isaias's answer does not contradict Degn's testimony because Degn did not say he discussed the concept of an "aggravated" felony with Isaias and, most importantly for purposes of this appeal, Degn testified he said deportation "could" happen, not that it was mandatory or "would definitely happen."

told me, that that was the reason that I could use that to appeal. I didn't know what that was." We interpret this response to mean that Degn told Isaias that a no-contest plea would preserve his right to appeal the ruling allowing the statements Isaias made on the day of his arrest to be admitted into evidence.

Isaias's attorney also asked him whether he would have chosen to go to trial if he had known that the plea of no contest to the charges subjected him to mandatory deportation. Isaias answered: "Well if he would have explained to me what would have happened, then I think I would've decided to fight my case, because they will never allow me to speak." To clarify this answer, his attorney asked: "Are you saying if you had known at the time of your plea that these charges would subject you to … mandatory deportation, would you have gone to jury trial?" Isaias answered: "If he would have explained to me exactly how everything works, I think I would've said no."

After hearing the testimony and counsel's arguments, the superior court denied Isaias's motion to vacate, stating "it comes down to a preponderance of the evidence." The court noted there were "a lot of discrepancies between the testimony of" Isaias and Degn, with Degn testifying that he did talk to Isaias about the immigration consequences, which included deportation. The court stated the record reflected that Isaias "was told on more than one occasion by more than one person that he would be deported. Ultimately the judge is saying you're gonna be deported. You understand this is what a no-contest plea is." The court concluded its ruling by stating:

> "Finally, the question asked of Mr. Torres today is, 'What would you have done if you had known this?' And he said, 'I think I would've said no.' That doesn't say, like, there is no way I would have said no. He said today, 'I think I would have said no.'

> "And I wrote that down, because it struck the Court. So I believe that based on that, the burden has not been met and I'm going to deny the motion."

> In December 2020, Isaias filed a notice of appeal.

9.

**DISCUSSION**

I.    OVERVIEW OF SECTION 1473.7

In 2016, the Legislature considered the problems faced by defendants "who were unaware of the immigration consequences posed by a plea entered many years earlier." (*Vivar, supra,* 11 Cal.5th at p. 528.) The Legislature adopted section 1473.7 to make relief available "to certain immigrants who accepted pleas without understanding the immigration-related consequences of such decisions." (*Vivar, supra,* at pp. 523, 528.)

A.    <u>Grounds for Vacating a Conviction</u>

The version of section 1473.7, subdivision (a) in effect when the motion was filed and heard in 2020 stated:[4]

> "A person who is no longer in criminal custody may file a motion to vacate a conviction or sentence for any of the following reasons: [¶] (1) The conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere. A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (Former § 1473.7, subd. (a)(1).)

Pursuant to section 1473.7, subdivision (e)(1), the moving party has the burden of proof by a preponderance of the evidence. (See *Vivar, supra*, 11 Cal.5th at p. 517.) When a motion to vacate a conviction is granted, "the court shall allow the moving party to withdraw the plea." (§ 1473.7, subd. (e)(3).) Accordingly, "[a] successful section 1473.7 motion requires a showing, by a preponderance of the evidence, of a *prejudicial* error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea." (*Vivar, supra*, at p. 517.)

---

[4]    The amendment adopted by the Legislature in 2021, which became effective on January 1, 2022, is not relevant to the issues presented in this appeal. (See Stats. 2021, ch. 420, § 1.) The amendment replaced the phrase "plea of guilty or nolo contendere" with the broader phrase "conviction or sentence." (§ 1473.7, subd. (a)(1).)

B.    Standard of Review

A superior court's decision to grant or deny a section 1473.7 motion is subject to independent review.  (*Vivar, supra,* 11 Cal.5th at pp. 526.)  Under this standard of review, an appellate court exercises its independent judgment to determine whether the facts satisfy the applicable rule of law.  (*Id*. at p. 527.)  Independent review is not the same as de novo review because an appellate court may not second-guess factual findings based on the superior court's own observations.  (*Ibid*.)  Thus, factual findings based on the credibility of witnesses that the superior court heard and observed are entitled to deference.  (*Id*. at pp. 527–528.)  In contrast, where a factual determination is derived entirely from written declarations, transcripts, and other documents (i.e., a cold record), the superior court and appellate courts are in the same position and deference is unwarranted.  (*Id*. at p. 528.)  "Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Ibid*.)

The superior court received testimony from witnesses present in the courtroom and testimony from Isaias over the telephone.  Isaias was at the Aurora detention facility and, therefore, the court was not able to see Isaias and observe his demeanor.  The court also stated that the interpreter would be "letting us know what he says, because we can't really hear him."

In *Vivar*, the Supreme Court did not address how an appellate court should treat testimony when the witness is not present in the courtroom, appears by telephone, and testifies through an interpreter.  Based on the rationale that deference is not warranted for factual determinations made by a superior court when the appellate court is in the same position, we conclude deference is not required when the witness is not physically present in the courtroom, appears by telephone, and testifies through an interpreter.  Therefore, we conclude the superior court's analysis of Isaias's testimony is not entitled to deference and we will independently evaluate that testimony.

II. SHOWING OF PREJUDICIAL ERROR

When examining whether a moving party established the existence of prejudicial error, we first consider whether he demonstrated the existence of an error and then address whether the error was prejudicial.

A. Defendant's Own Error

1. *Aggravated Felonies and Related Consequences*

Federal immigration law provides the foundation for our review of Isaias's understanding of the immigration consequence of his plea. Federal immigration statutes define the term "aggravated felony" to include "sexual abuse of a minor." (8 U.S.C. §§ 1101(a)(43)(A).) An "alien who is convicted of an aggravated felony at any time after admission is deportable." (8 U.S.C. § 1227(a)(2)(A)(iii).) In addition, an "alien who at any time after admission is convicted of … a crime of child abuse … is deportable." (8 U.S.C. § 1227(a)(2)(E)(i).)

Before 1996, certain lawful permanent residents could apply for a discretionary waiver of deportation. (*United States v. Garcia-Morales* (S.D.Cal. 2015) 150 F.Supp.3d 1201, 1203, fn. 1.) In 1996, Congress amended the immigration statutes to make person convicted of an aggravated felony ineligible for such relief. (*Ibid*.. see 8 U.S.C. § 1229b(a)(3) [removal for person convicted of aggravated felonies cannot be cancelled].) Consequently, a lawful permanent resident convicted of an aggravated felony is subject to deportation, is excluded from readmission to the United States, and cannot become a naturalized citizen. (See *People v. Perez* (2018) 19 Cal.App.5th 818, 822 [advisement form used in San Diego County in 2005 referred to aggravated felonies and these three consequences].) Additional consequences of an aggravated felony conviction include disqualification "from most waivers and forms of relief from removal" and "greatly reduced procedural rights in detention and removal proceedings." (Kesselbrenner & Rosenberg, Immigration Law and Crimes (Winter Ed./ 2021) § 7:22, p. 695, fns. omitted.) Example of disqualification from forms of relief include (1) not being eligible

12.

for voluntary departure in a removal proceeding and (2) being barred from applying for, or being granted, asylum. (*Id.* at pp. 830–831; see 8 U.S.C. §§ 1229c(a)(1) [alien convicted of an aggravated felony may not be permitted to voluntarily depart the United States], 1158(b)(2)(B)(i) [asylum].)

### 2. *Defendant's Subjective Misunderstanding*

A defendant's own error in understanding the immigration consequences of the plea is a basis for relief under section 1473.7, subdivision (a)(1). (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 768–769; *People v. Mejia* (2019) 36 Cal.App.5th 859, 871; *People v. Camacho* (2019) 32 Cal.App.5th 998, 1009 (*Camacho*).) In *Alatorre*, the Fourth District reviewed the case law and stated that "cases have uniformly followed the lead of *Camacho* and *Mejia*, concluding that a petitioner's own subjective error qualifies for relief under the statute if the evidence shows he or she misunderstood the immigration consequences of a plea deal." (*Alatorre*, *supra*, at p. 769.) This principle is significant here because Isaias need not prove that (1) the superior court erred in advising him of the immigration consequences of his plea or (2) his counsel erred by providing ineffective assistance during the plea process. Accordingly, in this appeal, we only address whether Isaias has proven by a preponderance of the evidence that he did not meaningfully understand and knowingly accept mandatory deportation, one of the immigration consequences of his plea.

### 3. *The Court's Immigration Advisement*

It is undisputed, based on the transcript from the plea hearing that Isaias answered "Yes" when the superior court asked if he understood the following advisement: "If you're not a citizen of the United States, you'll be deported. You won't be allowed naturalization, readmission to the United States, or re-entry into the United States."

13.

This advisement is similar to the advisement given to the defendant in *Camacho* and is worded more strongly than the advisement required by section 1016.5.[5] At the plea hearing in *Camacho*, "the prosecutor stated, 'If you are not a citizen of the United States your conviction in this case will result in your being deported, excluded from the U.S., and denied naturalization.' " (*Camacho*, *supra*, 32 Cal.App.5th at p. 1002, fn. 2.) In *Camacho*, the appellate court concluded that the advisement could not be taken as irrebuttable proof that the defendant understood and accepted the adverse immigration consequences of his plea. (*Id*. at p. 1011, fn. 8; see *People v. Patterson* (2017) 2 Cal.5th 885, 889, 898 [a § 1016.5 advisement does not categorically bar a motion to withdraw the plea under § 1018 on grounds of mistake or ignorance].) In accordance with these decisions, the fact Isaias said he understood the court's advisement does not end our inquiry. Stated any way, when Isaias told the court that he understood, it is possible he was mistaken and, in fact, he did not meaningfully understand and accept the adverse immigration consequences of his plea.

### 4. *Immigration Advice from Counsel*

One of the reasons that courts are required to advise defendants about immigration consequences "is to enable the defendant to seek advice from counsel about the actual risk of adverse immigration consequences." (*People v. Patterson*, *supra*, 2 Cal.5th at p. 896.) As a result, what counsel told a defendant about the immigration consequences of his plea may be more important when evaluating his subjective understanding than the advisement received from the court.

---

[5] Section 1016.5, subdivision (a) provides: "Prior to acceptance of a plea of guilty … to any offense punishable as a crime under state law … the court shall administer the following advisement on the record to the defendant: [¶] If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged *may* have the consequences of deportation, exclusion from admission to the United States, *or* denial of naturalization pursuant to the laws of the United States." (Italics added.)

In this case, Degn testified in person at the hearing on Isaias's motion to vacate his conviction. As a result, the superior court had the opportunity to observe Degn as he testified and, therefore, we defer to its implied finding that Degn's testimony about the immigration advice he gave Isaias was credible. (See *Vivar*, *supra*, 11 Cal.5th at pp. 527–528.)

Degn testified he learned that Isaias was a lawful permanent resident with a greencard. Degn stated he had two conversations with Isaias about immigration consequences—once at the jail and once at the courthouse. Degn described the events leading to one conversation about immigration consequences by stating:

> "I think as we were getting closer to the trial date and Mr. Torres was pretty strong-willed and wanting to do his trial, I knew as we were getting closer to that and the offers were getting better from not necessarily the people, but the judge was willing to tweak some things and have what would look like a pretty good resolution, as we discussed that, I did talk to him about immigration consequences."

Degn did not recall taking any notes of the conversation, produced no notes in response to a subpoena duces tecum, and described the contents of the conversation about deportation as follows:

> "The discussion we had was that could happen. I did not tell him it would definitely happen at that point when we would have those discussions. What I said that was the conviction would qualify him for that adverse immigration consequence, that he could be deported. I think I said they still – the government's still a bureaucracy. How they enforce that, I don't know."

We accept this testimony as an accurate description of what Degn told Isaias. Degn also testified that he did not practice immigration law and did not retain an immigration attorney to review Isaias's case. When asked if he sought the advice of an immigration attorney about the consequence of Isaias's plea, Degn stated:

> "I'm not entirely sure. I know that shortly before he became my client we had -- I was active in the local bar. We had an immigration attorney come and speak and talk about very specifically about the immigration

15.

consequences to people and specifically as to different statuses. So I find it fascinating because Mr. Torres was -- had his green card. He was a permanent resident was my understanding. It had to be a pretty severe conviction for a crime before they would take action. So the attorney that gave that seminar and I had some subsequent conversations .…"

Degn did not testify he advised Isaias that, for immigration purposes, the felony charges were aggravated felonies and crimes involving moral turpitude.

When Isaias testified, he was asked if Degn advised him that the offenses would be considered aggravated offenses for immigration purposes and subject him to *mandatory* deportation. Isaias answered: "No. He never told me anything about that." This testimony does not contradict Degn's testimony that he told Isaias "that he *could* be deported," which is different from telling him that deportation was mandatory. (Italics added.)**6**

### 5. *Proof of a Misunderstanding*

Based on our independent review of the record and giving deference to the superior court's implied credibility findings regarding the witnesses observed, we find it is more likely than not that Isaias did not meaningfully understand and knowingly accept mandatory deportation as a consequence of his plea. (See § 1473.7, subd. (e)(3) [preponderance of evidence standard].) We find Degn advised Isaias that he could be deported, that a government bureaucracy was involved, and that Degn did not know how deportation would be enforced. This advice did not inform Isaias that he was pleading to aggravated felonies, that deportation was mandatory, and that immigration authorities lacked the discretion not to deport him.

The advice given to Isaias is similar to the information provided the defendant in *Vivar*. He was given an advisement that deportation was a possibility when, in fact, it was mandatory. (*Vivar*, *supra*, 11 Cal.5th at p. 533.) Like that defendant, Isaias was

---

**6** Similarly, Isaias's testimony that he was not advised the offenses were considered crimes involving moral turpitude does not directly contradict Degn's testimony, which made no mention of crimes involving moral turpitude.

given false hope by being told that deportation *could* happen instead of being told that deportation was mandatory. Here, we find it is more likely than not that Isaias did not meaningfully understand and knowingly accept *mandatory* deportation as one of the immigration consequences of his plea. (§ 1473.7, subds. (a)(1), (e)(4).)

C.     Prejudice from the Error

1.     *Legal Standard for Prejudice*

Although section 1473.7 requires the moving party to establish prejudicial error, it does not define the word "prejudicial." Our Supreme Court addressed the lack of a definition by deciding an error is prejudicial for purposes of section 1473.7 if the defendant "demonstrat[es] a reasonable probability that [he] would have rejected the plea if [he] had correctly understood its actual or potential immigration consequences." (*Vivar, supra,* 11 Cal.5th at p. 529.) In assessing whether a reasonable probability has been shown, courts must consider the totality of the circumstances. (*Ibid.*) In considering all the circumstances, certain factors are particularly relevant, including (1) the defendant's ties to the United States, (2) the importance the defendant placed on avoiding removal, (3) the defendant's priorities in seeking a plea bargain, and (4) whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible. (*Id.* at pp. 529–530.)

The reasonable probability standard " ' "does not mean more likely than not." ' " (*People v. Rodriguez* (2021) 68 Cal.App.5th 301, 324.) Instead, it means merely a reasonable chance, which is more than an abstract possibility. (*Ibid.*) Stated another way, a reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Ibid.*)

2.     *Showing of Prejudice*

Isaias's declaration stated that if he had known that his plea would have such severe adverse immigration consequences, he would have proceeded to trial. His

declaration stated that, at the time of his plea, the United States was his home, he had been here for 30 years, and his family was here. As described earlier and as observed by the superior court, Isaias's oral testimony was not as strongly worded. Isaias stated that "I think I would've decided to fight my case" and "I think I would've said no" to the plea offered if the immigration consequences had been fully explained.

Initially, we note that respondent has not cited, and our independent research has not located, any published case concluding that, under the standard for prejudice adopted in *Vivar*, a defendant must testify that he or she absolutely would have rejected the plea if he or she had fully understood its immigration consequences. We decline to be the first appellate court to adopt such a conclusion because it is not compatible with the reasonable probability test for establishing prejudice. (See *People v. Rodriguez*, *supra*, 68 Cal.App.5th at p. 324.)

At the other end of the continuum, we note that courts do not accept at face value a defendant's assertion that he or she would have behaved differently or likely would have behaved differently if fully aware of the immigration consequences of the plea. Such assertions must be corroborated with objective evidence, some of which must be contemporaneous with the plea. (*Vivar*, *supra*, 11 Cal.5th at p. 530.) In other words, courts do not simply accept a defendant's statement of regretting the plea but must substantiate that statement by looking to contemporaneous evidence. (*People v. Mejia*, *supra*, 36 Cal.App.5th at p. 872.)

The first contemporaneous evidence we consider is Isaias's personal ties to the United States. (*Vivar*, *supra*, 11 Cal.5th at p. 530 [defendant's ties to the United States are particularly relevant].) Isaias came to the United States in 1982 and has lived here is entire adult life. His parents and five siblings lived in Tulare County. From his arrival until his arrest in April 2011, approximately 29 years, he worked in Tulare County. His son and his daughter were citizens of the United States. These details strongly support the inference that mandatory deportation was an outcome he would have sought to avoid.

18.

(See *Vivar*, *supra,* at p. 532 [family ties and other objective, contemporaneous facts corroborated defendant's prejudice claim].)

Other contemporaneous evidence includes Isaias's concerns and priorities at the time of the plea. Degn testified that one of Isaias's concerns about entering a plea was Isaias's belief that he was innocent of the charges. Degn also stated that Isaias "was pretty determined to go to trial." Furthermore, Isaias's reluctance to enter a plea is corroborated by Degn's testimony that, within a week or two of entering the plea, Isaias wanted to withdraw it. This reluctance, though not based on immigration consequences, is relevant to our inquiry into prejudice because it makes it easier for Isaias to establish the requisite *reasonable probability* that he would have rejected the plea if he had correctly understood its actual or potential immigration consequences. (*Vivar, supra,* 11 Cal.5th at p. 529.) When a defendant is shown to be wavering between going to trial and entering a plea, it takes less evidence to tip the balance towards a reasonably probability that he would have gone to trial than when a defendant readily accepts the plea.

Based on our independent review of Isaias's testimony and the surrounding circumstances, we conclude that if Isaias had meaningfully understood the mandatory immigration consequences of his plea in 2012 (i.e., permanent deportation), versus the potential risks and benefits of going to trial, it is reasonably probable that he would not have pleaded guilty. A reasonable probability can be established without Isaias establishing it was more likely than not that he would have gone to trial. (See *People v. Rodriguez*, *supra*, 68 Cal.App.5th at p. 324.) He need only establish a reasonable chance, which is more than an abstract possibility. (*Ibid.*)

Consequently, we conclude Isaias has affirmatively established a "prejudicial error" within the meaning of section 1473.7, subdivision (a)(1). (Cf. *People v. Mejia*, *supra*, 36 Cal.App.5th at p. 873.) The appropriate relief on appeal is to reverse and remand with directions to grant his section 1473.7 motion. (See *People v. Alatorre*, *supra*, 70 Cal.App.5th at p. 771 [reversed order denying the § 1473.7 motion and

19.

remanded with directions to grant the motion]; *People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1006 [same]; *Mejia*, *supra*, 36 Cal.App.5th at p. 874 [same]; *Camacho*, *supra*, 32 Cal.App.5th at pp. 1004, 1012 [same].)[7]

## DISPOSITION

The order denying the section 1473.7 motion is reversed. The matter is remanded and the superior court is directed to file an order granting the motion and vacating the conviction no later than 10 calendar days after the issuance of remittitur.

---

[7] Since the statute became effective on January 1, 2017, the Fifth District has received approximately 24 appeals involving motions to vacate pursuant to subdivision (a)(1) of section 1473.7. Of the 13 appeals from Tulare County, five denials of a motion to vacate have been affirmed, four denials (including this case) have been reversed with directions to grant the motion, and three denials have been reversed for a rehearing. The other appeal is pending.

In one of the cases affirming a denial, the California Supreme Court granted review to consider whether the defendant demonstrated prejudice from trial counsel's failure to properly advise him of the immigration consequences of his plea. (*People v. Espinoza* (May 28, 2021, F079209) [nonpub. opn.] rev. granted Sep. 15, 2021, S269647.)